563 So.2d 117 (1990)
Helen WHITE, Dwight Hewett, Rafael Conte, Raul Llorente, Karen Llorente, Ignacio Tamayo, Owen Zayas Bazan, Dr. Eric Softley, Helmut Bracke, Helen Lancaster, Eugenio Albarran, George O'Brien, Enrique Audrain, Elsa Audrain, Louis Garisto, Juan Camacho, Vivian Camacho, Dr. Daniel Mandri, Monica Mandri, Jeronimo Paseiro, Dr. Claudina Mojer, Esteban Ferrer, Susan Ferrer, Helen Walker, Jeannie Fields Dubow, Martine A. Glasgall, Dr. Alonzo Portuondo, Madeline Portuondo, B.J. Grady, Toolie Millard, Laura Chamblis, Margaret O'Keefe, Marion Murphy, Henrietta Labarrere, Barbara Casper, Patricia Ryan, Dr. Alfredo Crucet, Delia Crucet, Ann Schubert, Carolyn Fowler, Alonzo Portuondo, Connie Portuondo, Christina Conte, George Fox, Maria Costa, Arnold McDonald, Graciela McDonald, Ernie Cambo, Dick Hodges, Thomas Roussel, Barbara Wheelock, J.J. Donoghue, Anne Donoghue, Dr. Eduardo Delgado, Richard O'Connell, Paul Crick, Anne Crick, Walter Sommer, Charles Austin, Tuck Austin, Devere Curtis, Muriel Curtis, Elena Cora, Miguel Bacallao, Rosario Bacallao, Robert Charbonneau, Renan Moreira, Margaret Matheson Randolph, and Malcolm Matheson, Jr., Appellants,
v.
METROPOLITAN DADE COUNTY, Appellee.
No. 88-2450.
District Court of Appeal of Florida, Third District.
May 22, 1990.
*120 Walton Lantaff Schroeder & Carson and Gregory J. Willis, Miami, for appellants.
Robert A. Ginsburg, Deborah Bovarnick Mastin, and Eileen Ball Mehta, Miami, for appellee.
Tew, Jorden, Schulte & Beasley and Dan Paul, Miami, for the Friends of the Everglades, as amicus curiae.
Before NESBITT, BASKIN and GERSTEN, JJ.
GERSTEN, Judge.
Amid the turmoil attendant to living in an urban environment, on an island off an island, called Key Biscayne, there exists a sylvan spot of tranquility  Crandon Park. Key Biscayne, which is actually a barrier island protecting Biscayne Bay from the Atlantic Ocean, was originally owned by a Dade County pioneer family surnamed Matheson. In 1940, the Mathesons gave the people of Dade County, Florida, access to and enjoyment of that portion of Key Biscayne which came to be known as Crandon Park.
The Mathesons' deed to Dade County contained the following simple deed restriction: "for public park purposes only." In spite of the limitation contained in the deed restriction, Dade County took part of the land deeded by the Mathesons and used it for the development of the Lipton International Tennis Center. Two Matheson family heirs, together with residents of Dade County, sought to enjoin the construction of the center for: (1) violating the restriction in the original deed; (2) violating Dade County's Comprehensive Development Master Plan; and, (3) failing to conform to the requirements of state law with respect to review of developments of regional impact concerning a proposed tennis stadium.
The trial court held an evidentiary hearing and found that: (1) appellants were not the proper parties to raise the deed restriction issue; (2) the use of the park for a commercial enterprise did not negate the main purpose of the park property under these facts; (3) Dade County had complied with its Comprehensive Development Master Plan (CDMP) in the construction of the tennis complex; and (4) "Development of Regional Impact" (DRI) review, as it pertained to the proposed stadium, was outside the ambit of the action. The court issued a final judgment denying injunctive and declaratory relief from: (1) the development of the Lipton International Tennis Center on Key Biscayne; and (2) the holding of the Lipton International Players Championship Tennis Tournament on Key Biscayne. It is from that final judgment that this appeal follows. We reverse.

I. FACTS
In 1940, several members of the Matheson family deeded three tracts of land located *121 on the northern portion of Key Biscayne to Dade County. This land, consisting of 680 acres, came to be known as Crandon Park. In the recorded deeds, the grantors expressly provided:
This conveyance is made upon the express condition that the lands hereby conveyed shall be perpetually used and maintained for public park purposes only; and in case the use of said land for park purposes shall be abandoned, then and in that event the said [grantor], his heirs, grantees or assigns, shall be entitled upon their request to have the said lands reconveyed to them.
Since that time, several amendatory deeds have been issued by the grantors to allow ancillary uses which may have been otherwise violative of the deed restriction. The additional uses permitted were the construction of public roads, public utilities, and "houses, apartments and facilities for the use of employees engaged in [the] care, maintenance and operation" of Crandon Park. The last amended deed permitted the building of a firehouse on the property. However, the grantors' heirs refused to allow the building of a cable satellite dish. The grantors, their heirs, or assigns, have not waived the deed restriction as to any other construction or use. In 1963, a section of the park was utilized as a dump. This use was never approved or sanctioned by the grantors, their heirs, or assigns.
In 1986, the Dade County Board of County Commissioners passed Resolution R-891-86, which authorized the execution of an agreement with Arvida International Championships, Inc., (Arvida), and the International Players Championship, Inc., (IPC), to construct a permanent tennis complex. The construction of the court facilities and infrastructure began in the summer of 1986, and terminated in 1987. Initially, the tennis complex consisted of fifteen tennis courts, service roads, utilities, and landscaping, all located on 28 acres.
The agreement provided that for two weeks each year, subject to a renewal provision, the tennis complex would become the site of the Lipton International Players Championship Tennis Tournament (Lipton tournament). This renowned tournament is only open to world class players who compete for two weeks.
In February 1987, the first Lipton tournament was held before approximately 213,000 people. The county manager considered the Lipton tournament to be such a tremendous success that he recommended, and the County Commission approved in Resolution R-827-87, the construction of "Phase II," a permanent clubhouse/fitness facility. This 15,000-to-33,000-squarefoot facility was to house locker rooms, training and exercise equipment, meeting rooms, food and beverage concessions, and a sporting goods store. As a result of "community input," the clubhouse was ultimately reduced to 9,800 square feet. This "community input" consisted of informal meetings with residents and one public hearing.
During the four Lipton tournaments held thus far on Key Biscayne, temporary seating has been provided. Appellants contend that a 12,000-seat permanent stadium is part of the future development plans. Although Dade County admits that "[a] stadium is a future possibility," it asserts that "no unified plan of development for a stadium exists, and no approvals or permits for any stadium have been issued."
The record reveals only one public hearing has been held regarding the tennis facilities. In July 1987, a public hearing was held pursuant to section 33-303 of the Metropolitan Dade County Code (1987). Section 33-303 requires a hearing be held before the construction of any new government facility. This hearing involved only the approval of the site plan for the proposed clubhouse. No other public hearing has been held either for the previous construction or the projected stadium.
Although the site is classified as "environmentally sensitive parkland" in Dade County's Comprehensive Development Master Plan (CDMP), no hearings have been held to change that designation in the CDMP. In 1989, the clubhouse was completed.
The facilities are closed to the public for specified periods of time both before and *122 after the two-week Lipton tournament. Dade County's agreement with the tournament sponsors, Arvida and IPC, gives them control of the tennis complex during what is called the "Tournament Period." The "Tournament Period" is defined in the agreement as the:
three weeks prior to the beginning of the calendar week in which the qualifying rounds of the Tournaments ... are to be played ... and continuing until the date occurring one (1) week after the completion of such Tournaments concerned.
In addition, the contract gives the tournament sponsors "reasonably necessary" time before the "Tournament Period" for site preparation. Arvida and IPC are also each afforded 45 days and 30 days, respectively, after the "Tournament Period" for site dismantling.
With respect to the 1987 tournament, the agreement specifically provided for Arvida to have "Priority Use" of the "grandstand and stadium court areas from November 1, 1986 through a period ending 45 days after the conclusion of the Tournament." The agreement defines "Priority Use" as "[t]he unimpaired right of [Arvida and IPC] ... to permit, reasonably restrict and control access to the Site... ."
Dade County offered testimony at trial that the public was only excluded from using the facilities for some three to four weeks. However, under the clear wording of the agreement, relative to the 1987 tournament, Arvida had the right to exclude the public from the tennis complex for as long as five months.
During the tournament, the sponsors are given most of Crandon Park's parking spaces to provide parking for the tournament spectators. The agreement provides that the "County will designate adequate parking facilities in the currently existing Crandon Park parking areas ... for Priority Use in connection with the Tournament."
The contract estimated that the parking needs of the tournament would "not exceed 4,000 spaces per day." These 4,000 spaces were not sufficient to satisfy the needs of tournament spectators and other park visitors. At trial, Earl Buchholz, Jr., the tournament operator, testified that tournament spectators parked not only at Crandon Park, but at the Marine Stadium, as well. Correspondingly, Dr. Charles Pezoldt, Deputy Director of Dade County Parks and Recreation Department, testified that during the final Saturday and Sunday of the tournament, the parking lots were temporarily closed to the public.
In 1987 and again in 1988, Dade County attempted to obtain the consent of one of the heirs, Hardy Matheson, for the operation of the Lipton tournament. Hardy Matheson refused to give his consent, and informed the County that the tennis complex and the operation of the Lipton tournament was contrary to the deed restriction.
Appellants, joined by the Friends of the Everglades in an amicus brief, raise three issues on appeal: (1) that the trial court erred in refusing to declare that the placement of the tennis complex and the holding of the Lipton tournament in Crandon Park violated the Matheson family deed restriction; (2) that the trial court erred in ruling that the construction of the tennis complex in Crandon Park was consistent with Dade County's CDMP; and (3) that the trial court erred in ruling it was premature to require the projected stadium to undergo DRI review and that the tennis complex, including the projected stadium, should be required to undergo DRI review.
Dade County responds that: (1) the tennis facility is consistent with the deed restriction limiting use to a public park; (2) the tennis complex is consistent with its CDMP; (3) any question relating to DRI review is premature; and (4) appellants lack standing to raise the issues they have brought on appeal.
We will address each issue separately.

II. THE DEED RESTRICTION

A. STANDING
Dade County contends appellants do not have standing to enforce the deed restriction. In order to enforce a deed restriction, *123 plaintiffs must show that they sustained an injury that was greater in degree than that sustained by the general public, Town of Flagler Beach v. Green, 83 So.2d 598 (Fla. 1955); Henry L. Doherty & Co., Inc. v. Joachim, 146 Fla. 50, 200 So. 238 (1941), or that the restriction in the deed was intended for the plaintiffs' benefit, Bessemer v. Gersten, 381 So.2d 1344 (Fla. 1980); Rea v. Brandt, 467 So.2d 368 (Fla. 2d DCA), review denied, 476 So.2d 675 (Fla. 1985).
Two of the appellants, Margaret Matheson Randolph and Malcolm Matheson, Jr., are heirs of the original grantors. The deed by which the land was transferred to Dade County included the provision that in the event the stated purpose was thwarted, "the said [grantor], his heirs, grantees, or assigns" were entitled to have the lands reconveyed to them. Since this restriction in the deed was intended for the benefit of the heirs of the grantors, we conclude that the appellant/heirs have the requisite standing to enforce the deed restriction.
We rule, however, that there exists a lack of standing as to the other appellants to raise the deed restriction issue. These other appellants have not shown that they sustained an injury greater in degree from that sustained by the general public or that the deed restriction was intended for their benefit. We will therefore determine whether Dade County has violated the deed restriction solely as it pertains to the claims of the appellant/heirs of the grantors.

B. DADE COUNTY'S VIOLATION OF THE DEED RESTRICTION
Appellant/heirs first contend that the construction of the tennis complex violates the deed restriction. As previously stated, the deed provides that the "lands hereby conveyed shall be perpetually used and maintained for public park purposes only."
"In construing restrictive covenants the question is primarily one of intention and the fundamental rule is that the intention of the parties as shown by the agreement governs, being determined by a fair interpretation of the entire text of the covenant." Thompson v. Squibb, 183 So.2d 30, 32 (Fla. 2d DCA 1966). Similarly, "the terms of dedications of lands for park purposes where the lands are conveyed by private individuals are to be construed more strictly than is the case where the lands are acquired by the public body by purchase or condemnation." Hanna v. Sunrise Recreation, Inc., 94 So.2d 597, 600 (Fla. 1957).
Appellant/heirs argue that it was the intent of the Matheson family to limit the use of Crandon Park to passive activities such as picnicking, swimming, and the like. We glean no such intention from the language of the deed. Further, the Florida Supreme Court has adopted a very broad definition for what a "park" encompasses. The court has stated:
[A] park is considered not only as ornamental but also as a place for recreation and amusement. Changes in the concepts of parks have continued and the trend is certainly toward expanding and enlarging the facilities for amusement and recreation found therein.
Hanna, 94 So.2d at 601. The court further explained that the permissible uses for a public park include:
[T]ennis courts, playground and dancing facilities, skating, a swimming pool and bathhouse, horseshoe pitching, walking, horseback riding, athletic sports and other outdoor exercises ... golfing and baseball ... parking facilities ... provided always that a substantial portion of the park area remains in grass, trees, shrubs and flowers, with seats and tables for picnicking, for the use by and enjoyment of the public.
Hanna v. Sunrise Recreation, Inc., 94 So.2d at 601 (quoting McLauthlin v. City and County of Denver, 131 Colo. 222, 280 P.2d 1103 (1955), with approval). We conclude, based on the Florida Supreme Court's broad definition of "park" contained in Hanna, that the construction of the tennis complex did not violate the "public *124 park purposes only" provision of the deed restriction.
Appellant/heirs next argue that turning the tennis complex over to a commercial operator violates the deed restriction. We do not agree. Florida courts have consistently ruled that commercial benefit does not defeat a park purpose. Hanna v. Sunrise Recreation, Inc., 94 So.2d at 601; State v. Daytona Beach Racing and Recreation Facilities District, 89 So.2d 34 (Fla. 1956); Sunny Isles Fishing Pier, Inc. v. Dade County, 79 So.2d 667 (Fla. 1955).
Finally, appellant/heirs contend that the operation of the Lipton tournament violates the deed restriction because it deprives the public of the use and enjoyment of Crandon Park, including the use and enjoyment of the tennis facilities. We are persuaded by this argument and rule that the holding of the Lipton tournament violates the deed restriction because it virtually bars the public use of Crandon Park during the tournament, and does bar public use of the tennis complex, for extended periods of time.
Courts have unfailingly guarded against encroachments on public parkland where such parkland is under the protection of a deed restriction or restrictive covenant. Fairhope Single Tax Corporation v. City of Fairhope, 281 Ala. 576, 206 So.2d 588 (1968) (construction of civic center or recreation building was not consistent with the dedication that the property be used for "park purposes"); City of Wilmington v. Lord, 378 A.2d 635 (Del. 1977) (construction of water tower in park violated deed restriction, limiting use of property to "public park purposes"); City of Miami Beach v. Kirsner, 178 So.2d 65 (Fla. 3d DCA 1965), cert. denied, 385 U.S. 920, 87 S.Ct. 231, 17 L.Ed.2d 144 (1966) (city's use of part of park for a dump violated deed restricting use of area for park purposes); Village of Croton-on-Hudson v. County of Westchester, 30 N.Y.2d 959, 335 N.Y.S.2d 825, 287 N.E.2d 617 (1972) (use of public park for solid waste disposal site violated dedication); Borough of Ridgway v. Grant, 56 Pa.Commw. 450, 425 A.2d 1168 (Commw. Ct. 1981) (placing of firehouse in a public park violated terms of deed restriction).
In ruling that the holding of the Lipton tournament violates the deed restriction, we note that a distinction must be made between "park purposes" and "public purposes." Assuming arguendo that the Lipton tournament is an economic success which brings innumerable benefits to Dade County and its citizens, such an undeniable public purpose is not consistent with a deed restriction mandating the narrower "public park purposes only." See Fairhope Single Tax Corporation v. City of Fairhope, 206 So.2d at 589.
In addition, the word "only" in the deed restriction at issue further buttresses our ruling that the operation of the Lipton tournament, as presently constituted, violates the restriction. As the court in Thompson v. Squibb explained, "the word `only' is synonymous with the word `solely' and is the equivalent of the phrase `and nothing else.'" Thompson, 183 So.2d at 32.
Dade County contends that the tennis complex is consistent with the "public park purposes" restriction provided for in the deed. In support, Dade County argues that the complex is open to the public when the tournament is not being held, the site of the tennis complex utilizes less than 5 percent of Crandon Park, and that a valid park purpose is served by "spectating." Dade County also points to the benefits derived by Dade County from having the Lipton tournament in Dade County.
Dade County relies on Hanna v. Sunrise Recreation, Inc., 94 So.2d at 597, as support for its contention that the tennis complex is consistent with the deed restriction. The facts of the present action are different from those in Hanna, in which a lessee was given the right to construct and operate golfing, tennis, refreshment, and other recreational facilities on land deeded to the state for "State park purposes." Hanna, 94 So.2d at 600-601. The facilities and use at issue in Hanna were to serve public recreational purposes.
Here, the public, in fact, is deprived from using these tennis facilities for a period of *125 three to four weeks during the Tournament Period. Further, under the contract as to the 1987 tournament, Arvida had the right to exclude the public for as long as five months.
In addition, the court in Hanna noted that the recreational use "would not amount to an ouster of the public therefrom." Hanna, 94 So.2d at 601. Here, the operation of the Lipton tournament, for all practical purposes, does amount to the virtual ouster of the public from the park for periods of time during the two-week tournament.
The contract gives the sponsors "Priority Use" of the parking areas of Crandon Park during the tournament. The contract estimated that the tournament needs "would not exceed 4,000 spaces per day." The amount of parking spaces was not adequate to meet the needs of tournament spectators and other park visitors as the testimony was uncontroverted that people were turned away from parking lots at the park. There was also uncontroverted testimony that some people found it necessary to park at the Marine Stadium.
We recognize that many legitimate park events, such as softball or golf tournaments, might fill up lots and make it difficult for latecomers to find a parking space at a certain area within the park. This, however, is not simply a case of a filled parking lot within a certain area of the park. The testimony demonstrates that the tournament apparently takes up all the available public parking spaces at Crandon Park for periods of time during the tournament. This is a public park parking nightmare.
We also recognize that the agreement between the tournament sponsors and the County required the County to provide shuttle services, if necessary, to transport tournament spectators. The parties' agreement, however, provides only for the County's shuttle transportation of spectators from the parking facilities in "Crandon Park parking areas."
In none of the cases which Dade County has cited to this court, see e.g., Ocean Beach Realty Co. v. City of Miami Beach, 106 Fla. 392, 143 So. 301 (1932); Kosanke v. City of St. Petersburg Beach, 256 So.2d 395 (Fla. 2d DCA 1972); Florida Little Major League Association, Inc. v. Gulfport Lion's Little League, Inc., 127 So.2d 707 (Fla. 2d DCA 1961), was the public's use and enjoyment of the public park infringed upon, as in the present case. In Ocean Beach Realty, for example, the plaintiff sued to recover possession of city property which had been conveyed to the city to be used exclusively for park purposes. The city had used a portion of the property to widen an abutting street. The court found that the use of a portion of the property to widen a roadway was not an abandonment of the park purpose. The court found:
The result is to make the park accessible to, and usable by, a greater portion of the public than it would have been accessible to, or could have been used by, had not this improvement been made... .
Ocean Beach Realty Co. v. City of Miami Beach, 143 So. at 302. Here, the result in effect, is to make the park inaccessible to, and unusable by the public for periods of time.
Dade County argues that the use of the property as a tennis complex is better than its previous use as a dump. While we agree that a tennis complex in a public park, is better than a dump in a public park, we note that the County's previous use of the site as a dump, was also in violation of the deed restriction. City of Miami Beach v. Kline, 189 So.2d 503 (Fla. 3d DCA 1966); City of Miami Beach v. Kirsner, 178 So.2d at 65-66. Dade County, in fact, conceded before the trial court that the dump was inconsistent with a public park purpose. We do not congratulate Dade County for shifting from one impermissible use to another.
Finally, Dade County argues, and we agree, that it is well settled that "equity abhors a forfeiture," that "such restrictions are not favored in law if they have the effect of destroying an estate," and that they "will be construed strictly and will be most strongly construed against the grantor." Dade County v. City of North *126 Miami Beach, 69 So.2d 780, 782-783 (Fla. 1953).
Appellant/heirs, however, clearly represented to this court and the trial court that they were not seeking a reversion. What appellant/heirs want is a declaratory judgment that the present use of the park is in violation of the deed restriction and an injunction to prevent any further erosion of the "public park purposes only" deed restriction.
Florida's declaratory judgment statute gives courts of this state jurisdiction to declare the rights of parties when there is a dispute over the interpretation of a deed. § 86.021, Fla. Stat. (1989). Further, injunctive relief has long been recognized as an appropriate remedy for violation of a deed restriction or restrictive covenant. Osius v. Barton, 109 Fla. 556, 147 So. 862 (1933); City of Miami Beach v. Kline, 189 So.2d at 505-506; Thompson v. Squibb, 183 So.2d at 33-34.
We therefore declare Dade County to be in violation of the deed restriction. We reverse the trial court order as to the deed restriction, and remand for entry of an order enjoining Dade County from permitting the Lipton tournament to proceed as it is presently held. Our ruling does not prevent Dade County from using the tennis complex for tennis tournaments. It merely seeks to insure that in holding such tournaments, public access to the rest of Crandon Park is not infringed; and use of the tennis complex is not denied to the public for unreasonable periods of time.

III. COMPREHENSIVE DEVELOPMENT MASTER PLAN

A. STANDING AND EXHAUSTION OF ADMINISTRATIVE REMEDIES
Dade County contends that appellants have no standing to pursue a CDMP challenge and further argues appellants' CDMP claim is barred for failure to exhaust their administrative remedies. In order to resolve these issues, some background on the laws governing master plans must be provided.
Dade County was required, pursuant to Florida's "Local Government Comprehensive Planning and Land Development Regulation Act," to adopt a comprehensive plan for future development applicable to all of Dade County. §§ 163.3161-.3215, Fla. Stat. (1989). The purpose of the act is "to protect human, environmental, social, and economic resources; and to maintain, through orderly growth and development, the character and stability of present and future land use and development in this state." § 163.3161(7), Fla. Stat. (1989). CDMP's are approved by the state and local governments, and developments undertaken or approved by local governments are required to be consistent with such master plans. §§ 163.3161, .3194, Fla. Stat. (1989).
In 1984, the Florida Supreme Court clarified the standing requirements for plaintiffs to pursue a master plan challenge under Florida's "Local Government Comprehensive Planning and Land Development Regulation Act." The court held "only those persons who already have a legally recognizable right which is adversely affected have standing to challenge a land use decision on the ground that it fails to conform with the comprehensive plan." Citizens Growth Management Coalition of West Palm Beach, Inc. v. City of West Palm Beach, Inc., 450 So.2d 204, 208 (Fla. 1984); see also, § 163.3215(1), Fla. Stat. (1989) ("[a]ny aggrieved or adversely affected party may maintain an action for injunctive or other relief against any local government to prevent such local government from taking action on a development order ... that is not consistent with the comprehensive plan"). In applying the standing requirements enunciated in Citizens Growth Coalition, the Fourth District Court of Appeal has ruled that property owners whose land adjoined a proposed development and who stood to be directly affected by the development, had standing to pursue a master plan challenge. Southwest Ranches Homeowners Association, Inc. v. Broward County, 502 So.2d 931 (Fla. 4th DCA), review denied, 511 So.2d 999 (Fla. 1987).
*127 In the present case, we rule that the two appellant/heirs of the grantors have standing to pursue a master plan challenge under the act because they have a legally protected property interest which was directly affected by the County's action. By including language in the deed providing for the grantor, his heirs, grantees, or assigns, to have the property reconveyed to them in the event the stated purpose was thwarted, the grantors created a "reversionary future estate" in land. See R. Cunningham, W. Stoebuck & D. Whitman, The Law of Property § 3.1, at 91 (1984) [hereinafter cited as The Law of Property]. This future estate is a "presently existing, legally protected property interest." See The Law of Property § 3.1, at 91.
We conclude, however, that the other appellants have not established the requisite standing to raise such challenge. No testimony was offered before the trial court that they were directly or adversely affected by the County's action. Nor did they show that they had a legally recognizable interest in the property. See Citizens Growth Management Coalition of West Palm Beach v. City of West Palm Beach, Inc., 450 So.2d at 208.
We next turn to the administrative remedies issue as it pertains to appellant/heirs. Dade County argues that appellants' CDMP claim is barred because they failed to exhaust their administrative remedies. Dade County contends that since it held the public hearing mandated by the CDMP and appellants failed to raise an objection at the hearing, appellants' CDMP claim is now precluded.
We are not persuaded by Dade County's argument on this point. The public hearing Dade County refers to was held in July of 1987. By the time of the hearing, Dade County had already ripped out the area necessary to construct the tennis complex. The County had also installed tennis courts and parking lots, all without holding public hearings.
Further, the first of the four planned Lipton tournaments had already been held. Since a significant portion of the damage had already been done by the time of the hearing, the administrative remedy available to appellant/heirs could not have afforded adequate or timely relief. Under these circumstances, we conclude that appellant/heirs' CDMP claim is not precluded for failure to exhaust their administrative remedies. See Gulf Pines Memorial Park, Inc. v. Oaklawn Memorial Park, Inc., 361 So.2d 695 (Fla. 1978); Warner v. City of Miami, 490 So.2d 1045 (Fla. 3d DCA 1986); School Board of Leon County v. Mitchell, 346 So.2d 562 (Fla. 1st DCA 1977), cert. denied, 358 So.2d 132 (Fla. 1978).
Having found that appellant/heirs have standing to pursue their CDMP challenge and that they are not precluded from raising their claim for failure to exhaust administrative remedies, we next determine whether Dade County has violated its CDMP.

B. DADE COUNTY'S VIOLATION OF ITS COMPREHENSIVE DEVELOPMENT MASTER PLAN
Appellant/heirs contend that Dade County failed to comply with the County's CDMP with respect to the development of the tennis complex at Crandon Park. Dade County asserts that it has complied with every requirement, has obtained every permit required, and is not in violation of its CDMP. Dade County further responds that the trial court's ruling that the complex is consistent with the CDMP, is supported by competent, substantial evidence.
The tennis complex is located in a zone, which is designated as "environmentally sensitive parkland" under Dade County's CDMP. The key guidelines for zones designated as environmentally sensitive, provide in part:
Activities which remove organic soils or scarify native rock formations should be minimized to the extent possible and should not disrupt the environmental functions of the zone.
Removal of native vegetation should be minimized, and further removal of bay heads or tree islands particularly avoided.

*128 No rock pits, borrow pits, roadways, building pads, or other development should be permitted to displace primary nesting, roosting, or feeding habitats for endangered, threatened, or rare wildlife, or species of special concern.
Anthony Clemente, former Director of Dade County's Department of Environmental Resources Management (DERM), testified that he had direct responsibility for applying the County's environmental criteria and for ensuring that the tennis complex was consistent with the County's CDMP. He testified that DERM conducted an evaluation of the proposed tennis complex and found that it would have no significant impact on environmentally sensitive areas, and the complex was consistent with the CDMP.
However, Clemente stated that certain requisite evaluations should have been done, such as the impact of the development on bird nesting and related environmental issues, before commencing construction. Clemente admitted that he could not find these evaluations in the file or verify that they had been completed.
This court has recognized that developments challenged as contrary to master plans must be strictly construed and that the burden is on the developer to show by competent and substantial evidence that the development conforms strictly to the master plan, its elements, and objectives. Machado v. Musgrove, 519 So.2d 629 (Fla. 3d DCA 1987), review denied, 529 So.2d 693, 694 (Fla. 1988). We find that Dade County has not met this burden of proof. Dade County did not present sufficient evidence to the trial court to demonstrate that the complex conforms strictly to the CDMP, its elements, and objectives. We rule that the construction of the parking lots, access roads, tennis courts, and clubhouse for the complex cannot be justified under the strict standard of review enunciated by this court in Machado.
We note that the County also argues that the area was improved from an environmental standpoint when Dade County cleaned up the dump site. Assuming this to be true, it still does not establish that the tennis complex is in compliance with the master plan.
Because Dade County has failed to show by competent and substantial evidence that the tennis complex complies with the guidelines for environmentally sensitive zones, as prescribed in the master plan, we find that the tennis complex is in violation of the CDMP. We reverse the trial court order on this point and remand for entry of an order enjoining any further development at the site.

IV. DEVELOPMENT OF REGIONAL IMPACT REVIEW

A. STANDING
Dade County contends that appellants do not have standing to enforce the statutes governing developments of regional impact review, and that enforcement of these statutes vests exclusively in the Florida Department of Community Affairs (FDCA). We do not agree.
Chapter 380 of the Florida Statutes (1989), mandates developments of regional impact to undergo a review and approval process. § 380.06, Fla. Stat. (1989). Nothing in chapter 380, Florida Statutes, however, has abrogated "the rights of citizens to challenge local zoning decisions in circuit court." Friends of the Everglades, Inc. v. Board of County Commissioners of Monroe County, 456 So.2d 904, 909 (Fla. 1st DCA 1984), review denied, 462 So.2d 1108 (Fla. 1985); see Caloosa Property Owners Association, Inc. v. Palm Beach County Board of County Commissioners, 429 So.2d 1260 (Fla. 1st DCA), review denied, 438 So.2d 831 (Fla. 1983). Persons with a legally recognized interest which will be directly affected by a zoning decision have standing to seek declaratory and injunctive relief with respect to the statutes governing DRI. See Friends of the Everglades, Inc. v. Board of County Commissioners of Monroe County, 456 So.2d at 909; Caloosa Property Owners Association, Inc. v. Palm Beach County Board of County Commissioners, 429 So.2d at 1264-1265.
*129 We recognize that the appellants who are not heirs of the grantors do not have standing under this test. We conclude, however, as we did with respect to the issue of appellants' standing to raise the violation of the CDMP; that the appellant/heirs do have standing to enforce the statutes governing developments of regional impact. Appellant/heirs are not just citizens who have sustained damages similar to that suffered by the community. Appellant/heirs hold a "reversionary future estate" in the property and they seek to safeguard that estate. See The Law of Property § 3.1, at 91. We will therefore consider whether the tennis complex, including the stadium, should be required to undergo DRI review solely as it applies to the claims of the appellant/heirs.

B. DADE COUNTY'S FAILURE TO UNDERGO DEVELOPMENT OF REGIONAL 
IMPACT REVIEW
Appellant/heirs contend that the tennis complex, including the proposed stadium, should be required to undergo DRI review. DRI review and approval is mandated for "any development which, because of its character, magnitude, or location, would have a substantial effect upon the health, safety, or welfare of citizens of more than one county." § 380.06(1), Fla. Stat. (1989). Both appellants and Dade County agree that a 12,000-seat stadium would be subject to DRI review. See §§ 380.0651(3)(b)(1)(b), 380.06(2)(d)(1)(b), Fla. Stat. (1989).
Dade County argues that the tennis complex and proposed stadium is not required to undergo DRI review until, and unless, the County commits to the construction of the stadium. This argument is without merit.
The laws governing DRI review do not allow developers to commence limited construction of a project which ultimately must undergo DRI approval without obtaining a final development order or a preliminary development agreement, in accordance with section 380.06, Florida Statutes, before commencing construction. Section 380.06(8), Florida Statutes, permits a developer to obtain a written preliminary development agreement from the FDCA as a prerequisite to engaging in limited construction of a project which will ultimately trigger DRI review. In order to prevent developers from dividing their project into phases to avoid the DRI review process, certain administrative rules were adopted by the state. These are referred to as "aggregation" rules or provisions.
At the time the project was commenced, the aggregation provisions in force were found in chapter 27F-18, Florida Administrative Code (1986). The purpose of chapter 27F-18, Florida Administrative Code, was to establish the criteria to determine when two or more developments should be aggregated as a single development for DRI review. Chapter 27F-18.003, Florida Administrative Code provided:
(1) Two or more developments shall be presumed to be aggregable if:
(a) The developments evidence common ownership or majority interest; and
(b) The time between completion of one development and acquisition of land for any other development is five (5) years or less; and
(c)1. The developments are rural developments and any boundary of one development is one (1) mile or less from any boundary of all other developments; or
2. The developments are urban developments and any boundary of one development is within one-quarter (1/4) mile or less from any boundary of all other developments.
The presumption thus raised could be rebutted by a showing that the individual components were not part of a unified plan of development. See Ch. 27F-18.004, F.A.C. The criteria for determining the existence of a unified plan of development was provided as follows:
The Department will consider the following factors to determine if two or more developments are components of a unified plan of development:

*130 (1) The nature and design of each development.
(2) The geographic proximity of the developments to each other.
(3) The temporal proximity between acquisition of land for development and completion of developments thereon.
(4) The ownership interests in the developments and relative activity of individual owners.
(5) Common management of the developments.
(6) Common advertising of the developments.
(7) Sharing of infrastructure between developments.
(8) A master plan or other corroborative documentation of a unified plan of development.
(9) Oral statements made about the developments by the officers or agents of the developer prior to the initiation of aggregation review by the Department.
(10) Separation and interconnection of developments....
(11) Separation of developments by natural or artificial barriers... .
Ch. 27F-18.005, F.A.C. The construction of the "tennis complex," including the projected stadium, even though it is to be accomplished in phases, falls within the definition of a "unified plan of development" under chapter 27F-18, Florida Administrative Code, thus subjecting the project to DRI review.
Chapter 27F-18, Florida Administrative Code (1986), was superseded in 1988 when its provisions were inserted in section 380.0651(4), Florida Statutes. Ch. 88-164, § 3, Laws of Fla. The aggregation provisions in section 380.0651(4), Florida Statutes, were revised from the previous aggregation provisions contained in chapter 27F-18, Florida Administrative Code.
Nothing in the new provisions, however, exempts the tennis complex and proposed stadium from DRI review as a "unified plan of development." These new provisions, in fact, strengthen the regulations requiring two or more projects meeting certain criteria to be aggregated and treated as a single DRI, subject to the review provisions of section 380.06, Florida Statutes. § 380.0651(4), Fla. Stat. (1989).
Dade County vehemently denies the proposed tennis stadium is part of a unified plan of development. In support of its contention, Dade County points out that no approvals or permits have been issued, and no hearing has been held with respect to the projected stadium. We are unpersuaded by the County's argument.
The record is replete and repeatedly resounds with references to the permanent stadium planned for the park: (1) the tournament director, Buchholz, admitted that his company was contractually obligated to place a 12,000-seat permanent stadium on the site; (2) the Coordinator of the Dade County Developmental Impact Committee, Carey Lee Rawlinson, Jr., admitted that the existing contracts commit the tournament director to construct a 12,000-seat permanent stadium; and (3) Interim County Manager, Dewey W. Knight, Jr., had informed the County Commissioners that contractually, construction of the permanent stadium must commence by December 31, 1990.
In addition, the County Commissioners passed resolutions in 1986 and in 1988, which expressly recognize the plans to construct a permanent stadium in Crandon Park. Dade County, Fla. R-891-86 (July 15, 1986); Dade County, Fla. R-712-88 (June 7, 1988). Indeed, the 1986 resolution authorizing the execution of an agreement with the tournament sponsors, attaches as an exhibit, a site plan depicting a permanent stadium to be constructed at the park. (See the appendix attached). The County also, in applications for permits to the Florida Department of Environmental Regulation and the United States Army Corps of Engineers, submitted drawings depicting the location of a permanent stadium to be constructed.
Additionally, in the resolution which the County Commissioners passed in 1988, recognizing the plans to construct a permanent stadium, the County also adopted an amendment to the contract between it and *131 the tournament sponsors. The amendment to the contract specifically requires IPC to "immediately ... pursue approvals and permits necessary to construct and use a 12,000-seat, first class permanent stadium" at the site. Dade County, Fla. R-712-88 (June 7, 1988).
We therefore reject Dade County's assertion that it is premature to require the tennis complex, including the proposed tennis stadium, to undergo DRI review. The record demonstrates ample proof that such stadium is part of a "unified plan of development" under the criteria set forth in chapter 27F-18, Florida Administrative Code, and as now statutorily prescribed and strengthened in section 380.0651(4), Florida Statutes.
Dade County next argues that a letter from the FDCA, dated May 27, 1988, exempts the development from the aggregation provisions. The letter states in part:
The Department has received your letter dated May 23, 1988, concerning proposed development at the Key Biscayne International Tennis Center in Dade County. Based on your representations, we understand that the developer has received local government approval to construct a 9,800 square foot clubhouse and locker room. It is our understanding that the developer is considering additional development consisting of a 4,800 seat tennis stadium at the Tennis Center, and may eventually develop a facility with a total of more than 12,000 permanent seats. However, according to your letter the developer has not yet requested or received local government approval to develop any permanent stadium seats.
The development currently approved by local government, which consists of a 9,800 square foot clubhouse and locker room, does not, by itself, constitute a Development of Regional Impact (DRI). If the developer seeks approval to develop permanent seating at the tennis center, we request that he obtain a binding letter of interpretation of DRI Status, or that the project undergo DRI review pursuant to Chapter 380, Florida Statutes, if applicable. If any proposed development at the tennis center is determined to be a DRI, the developer may wish to request a preliminary development agreement to allow limited development prior to receiving a DRI development order.
The Department reserves all its rights pursuant to Chapter 380, Florida Statutes, concerning this development and further review of the project may be required if the developer's plans are materially changed.
Section 380.0651(4)(d), Florida Statutes, provides that the aggregation provisions of section 380.0651(4), Florida Statutes, do not apply to developments in which, prior to July 1, 1988, the FDCA had issued "[w]ritten decisions, agreements, and binding letters of interpretation." We rule that this letter is not a written decision, agreement, or binding letter of interpretation, under this subsection.
Section 380.06(4), Florida Statutes, and section 380.06(8), Florida Statutes, define binding letters and preliminary development agreements. Section 380.06(4)(a), Florida Statutes, states in pertinent part:
If any developer is in doubt whether his proposed development must undergo development-of-regional-impact review under the guidelines and standards, ... he may request a determination from the state land planning agency [FDCA].
... .
1.(d) A request for a binding letter of interpretation shall be in writing and in such form and content as prescribed by the state land planning agency. Within 15 days of receiving an application for a binding letter of interpretation or a supplement to a pending application, the state land planning agency shall determine and notify the applicant whether the information in the application is sufficient to enable the agency to issue a binding letter or shall request any additional information needed... .
Section 380.06(8)(a), Florida Statutes, provides in part:
A developer may enter into a written preliminary development agreement with *132 the state land planning agency to allow a developer to proceed with a limited amount of the total proposed development... .
1. The developer shall comply with the preapplication conference requirements pursuant to subsection (7) within 45 days after the execution of the agreement.
Dade County presented no evidence to the trial court that it complied with either subsection (4) or subsection (8) in its receipt of the May 27, 1988, letter from the FDCA. Further, the May 27 letter makes clear that it is neither a binding letter of interpretation nor a preliminary development agreement. Moreover, the FDCA expressly reserved all its rights under chapter 380, Florida Statutes, concerning the development.
We also reject the contention Dade County made in the trial court that the May 27 letter is a "clearance letter." Nothing in the statutes or rules governing DRI provide for the issuance of "clearance letters" by the FDCA.
Based on the foregoing, we rule the development should be required to undergo DRI review.

V. CONCLUSION
We rule that the holding of the Lipton tournament in Crandon Park violates the deed restriction. Accordingly, we reverse the trial court order as to the deed restriction and remand for entry of an order enjoining the holding of the Lipton tournament as it is presently held. In addition, we declare that the tennis complex is in violation of the County's CDMP. We reverse the trial court order on this point and remand for entry of an order enjoining any further development at the site until Dade County is in compliance with its own CDMP.
Further, we declare that the development of the tennis complex was and is subject to DRI review. We therefore reverse the trial court order as to the DRI and remand for entry of an order enjoining Dade County from any further development at the site, unless the development is in accordance with the DRI review and approval process.
It is undisputed that the Lipton tournament and the tennis complex in which it is held serve a public purpose, that it brings tourism to Dade County, and attracts international and national media coverage, thereby enhancing Dade County's image. Dade County may wish to continue its sponsorship of the Lipton tournament at the tennis complex. It just cannot continue to do so by violating the deed restriction, its own CDMP, or Florida law.
Reversed and remanded with instructions.
BASKIN, J., concurs.
*133 
*134 NESBITT, Judge (dissenting):
In 1940, the Matheson family deeded to Dade County some 680 acres on Key Biscayne. The deed contained a restriction which stated that the land was to be used "for public park purposes only." The site, named Crandon Park, over the years has developed into a recreational area offering numerous and varied activities to the public. These include expansive beaches and picnic areas; a marina with a restaurant and bait and tackle shop; a championship eighteen-hole golf course constructed in 1970 with pro shop, locker room/clubhouse, snack bar and restaurant (the site of an annual professional golf championship tournament); boat ramps; bicycle paths; diving facilities; berths for charter deep sea fishing vessels; sports playing fields; an annual professional athletes' "Superstars" competition; and tennis courts. The park also contains maintenance facilities and numerous parking lots. Crandon Park was the site of the Metro Zoo until that attraction moved to new facilities off Key Biscayne in 1980.
In 1986, Dade County undertook construction of a tennis center on twenty-eight acres of Crandon Park. Even though most of the site selected was zoned environmentally sensitive park land, the area had previously been the site of a dump (landfill) and park maintenance yard. The center, initially consisting of fifteen tennis courts, service roads, and utilities, was built after the Board of Dade County Commissioners entered into a license agreement with sponsors of the two-week Lipton International Players Championship Tennis Tournament whereby the center would become the site of a yearly tennis tournament. Over 200,000 spectators have attended each year since the tournament began in 1987.
In 1988, Dade County commissioners proposed that a 33,000 square foot clubhouse, locker room, restaurant, pro shop complex be constructed at the center. After various informal hearings with Key Biscayne residents, as well as a public hearing mandated by section 33-303, Dade County Code, the county decided to reduce the size of the project to a locker room/clubhouse of 9,800 feet. Soon after the county commission authorized this project, several Key Biscayne residents, as well as other Dade County residents and two members of the Matheson family, filed this suit. Plaintiffs sought a declaratory judgment as to whether construction of the tennis center and its use for the Lipton Tournament violated the deed restriction requiring that the park be used for public park purposes only. Moreover, they sought to enjoin the county from further construction at the center based on allegations that the existing center, the approved clubhouse and a proposed 12,000 seat permanent stadium violated the Dade County Comprehensive Development Master Plan and Chapter 380 of the Florida Statutes which governs the grant of permits to build certain developments which will impact the state's natural environment. Plaintiffs requested that the court order the removal of all existing structures and the immediate review of the tennis center's compliance with Chapter 380, Development of Regional Impact requirements.
A hearing was held to decide whether or not the facts and allegations entitled plaintiffs to a temporary injunction. At that hearing, the county moved, and the plaintiffs agreed, to take testimony and evidence in order to make a final disposition of the case. The evidence adduced, viewed in the light most favorable to the county as the prevailing party, will be set out within the discussion of each of the three issues which this case requires us to address.

I. The Alleged Violation of the Deed Restriction
Plaintiffs allege that the tennis center was built strictly for the purpose of accommodating the Lipton Tournament which is a commercial enterprise, and thus the center is a violation of the deed restriction which requires the land deeded be used for public park purposes only. I agree with the reasoning and holding set forth by the majority that according to Florida law, construction of the tennis complex and the yearly tournament's management by a commercial operator do not defeat the public park purpose. However, I disagree with the majority's holding that the tournament *135 violates the deed restriction because it a) virtually bars the public's use of the entire Crandon Park facilities during the tournament period and b) does bar the public's use of the tennis complex itself for extended periods of time. I base my disagreement on the evidence set forth in the record.
First, the majority bases its conclusion that the public is denied use of the entire 680 acres of Crandon Park during the two-week tournament on its finding that people who want to attend the park in order to enjoy recreational pursuits other than the tournament cannot find a parking place. My colleagues hold that the tournament "does amount to the virtual ouster of the public from the park for periods of time during the two-week tournament." Majority op. at 125. There is a total lack of competent evidence in the record to support this holding.
Earl Buchholtz, Jr., the tournament organizer, testified that one of the primary reasons the Crandon Park site was selected was because of the parking facilities there. According to the contract between the county and the tournament organizer, the estimated parking needs during the tournament are 4,000 spaces per day to be provided in currently existing Crandon Park lots. The parties agreed that the county is to provide shuttle services to transport spectators from other parking facilities, if necessary, to the site of the event. The contract also provides that the county will provide public transportation to the tournament site from the Vizcaya and Brickell Metrorail stations and other key points in the county.
Dr. Charles Pezoldt, Deputy Director of the Dade County Parks and Recreation Department, testified that essentially four primary parking areas, located to the east side of Crandon Boulevard, are utilized to park the cars of those attending the tennis tournament. Pezoldt said that during nontournament times, those lots are used for beach-goers' parking and special activity parking. Pezoldt further testified that park attendance at the time of year the tournament is held (late winter/early spring) is light as compared to the summer time when many people visit the beach. According to his testimony, "Normal use [of the lots designated for tournament parking] is very, very light" during the weeks when the tournament takes place. "That's why the tournament works so well on the site," he said. Pezoldt went on to say that increased park attendance during this light season is "an asset because it's performing a recreational need for the people in the community to enjoy tennis as a spectator and for fulfilling their recreational pursuits."
Pezoldt stated that the county is currently studying parking uses at the park and that if there is a problem the county will modify the amount of parking at the park. He said that one consideration is to have the 600 to 800 volunteers who work at the tournament park off the island and be brought in by bus. He made clear that "the primary use" for the park will remain "the beach or [] any other recreational use." He emphasized that these activities "will have priority" over parking.
The record shows that on the Saturday and Sunday afternoons of the tournament's final matches of 1987 and 1988, the parking areas which normally serve the beach might have been temporarily full for certain periods with the vehicles of both tournament spectators and beach-goers; however, the testimony was that the lots would reopen as people left and parking became available. There was no testimony that the public was prevented from enjoying the myriad activities which Crandon Park has to offer in addition to the tennis tournament for even one day, much less for the full two weeks the tournament runs. The most that can be said is that for a few hours on two days, people arriving after a certain time of day may have found it difficult to find parking at the beach lots across from the tennis center site. Many legitimate park events  softball tournaments, professional golf tournaments, the Superstars competition as well as others  might fill up lots and make it difficult for latecomers to find a parking space at a certain area within the park. Accordingly, I emphatically disagree with the majority's *136 finding that the testimony shows that "apparently all the available public parking spaces at Crandon Park", maj. op. at 125, were taken up with the vehicles of tournament goers during certain periods. The record clearly does not prove this. There was absolutely no proof that any Crandon Park facilities were closed due to the tournament or that the public was ousted from any facilities during any time the tournament took place.
In short, the record simply does not support a finding that the deed restriction was violated because the public was ousted from the park; the public can and does use Crandon Park during the tennis tournament. In fact, during the tournament, so many people appear to be using the park that it could be said that a public park "nirvana" is reached. Consequently, I find it incomprehensible that the majority could find that the operation of the tournament amounts to an ouster of the public from Crandon Park.
Second, I disagree with the holding that the record demonstrates that the tournament bars public use of the tennis complex itself for extended periods. The record shows that Dade County controls programming at the tennis center for forty-six weeks of the year and that the commercial operator controls the center program for the other six weeks in order to operate the tournament. Simply because a commercial operator conducts the tennis center program, situated on a mere five per cent of the entire park, for a period of six weeks a year, it cannot be concluded that the tennis center is closed to the public's use during that entire time. Hanna v. Sunrise Recreation, Inc., 94 So.2d 597, 601 (Fla. 1957). It was established at the hearing that spectating at sporting events is one of the most popular recreational activities in the country. Throughout the tournament itself, while tennis enthusiasts cannot get on the courts and play tennis, spectators can enjoy watching the professional tennis matches which take place for the public's benefit. In its opinion, however, the majority chooses to ignore this evidence completely. Instead, the court holds that the tournament "virtually bars the public use of Crandon Park during the tournament, and does bar public use of the tennis complex, for extended periods of time." Maj. op. at 124. This holding is based on a clearly impermissible reevaluation of the evidence. E.g., Marshall v. Johnson, 392 So.2d 249 (Fla. 1980) (appellate court may not substitute its judgment for that of the trial court by reevaluating the evidence in the cause).
Although the plaintiffs alleged that the tennis complex is totally closed to the public for some eight to nine weeks due to pre-qualifying matches and the set up and take down of commercial booths, bleachers, and other appurtenances, the evidence adduced does not support this statement. According to the terms of the contract between the county and tournament operator, Arvida International Championships, Inc. (AIC), the "Tournament Period," during which time the AIC has full use of the site and facilities runs from three weeks before the qualifying tennis rounds, through the two weeks of the tournament and until one week after the tournament's completion. The tournament itself lasts for two of those six weeks. During the tournament, as the majority found, the center is put to public park use. Consequently, from the face of the contract itself, it appears that the park could feasibly be closed for some three to four weeks while the site is under AIC control but the tournament is not taking place. According to the testimony of tournament chairman Buchholtz, the complex can be utilized forty-nine weeks a year.
Appellants presented two witnesses in an attempt to prove their allegation that the tennis center is closed for public use for eight to nine weeks. Both were Key Biscayne residents who frequently passed by the tennis center site. One said that the center "was closed for a few weeks before and a period of time after" the tournament. The other said that the courts were closed during the weeks of the tournament. When asked by plaintiffs' counsel if the front gate leading to the center was locked for nine weeks, Deputy Parks and Recreation Director Pezoldt said, "I don't know the exact amount of weeks. I think it was *137 longer than it will be over time." This evidence does not prove the plaintiffs' allegations. Based on the testimony presented and the unambiguous language of the contract involved, the clear weight of the evidence permitted the trial judge to hold, as he did, that the tennis center is open to the public for forty-eight weeks a year. The remaining ninety-five per cent of the Crandon Park facilities are available to the public at all times.
The record shows that the public flocks to the tournament events, that the tournament operator makes every effort to maintain the courts open to the public during those times when the tournament is being set up and taken down; in sum, that the complex is not inaccessible to the public for eight to nine weeks out of the year. In addition, it is uncontroverted that most of the twenty-eight acre site devoted to the Lipton Tennis Tournament, which comprises some five per cent of the entire park, was previously an illegal dump which has been made accessible and converted to a public park use. Consequently, with the elimination of the dump more usable land has been devoted to the park.[1] The fact that this newly available recreational facility is closed to public use for three to four weeks in order to prepare for a tennis tournament which some 200,000 park-goers can enjoy does not amount to a violation of the deed restriction. The closing of the tennis center to public play for a brief period in order to prepare it for an event that is enjoyed by tens of thousands is most assuredly a fair trade-off. Even if the evidence in this record is considered in a light most favorable to the appellants, rather than the appellees, it will in no way support a determination that the public has been ousted or will be ousted from the park or the tennis facility. Obviously then, the majority has impermissibly substituted its judgment as to the weight of the evidence presented to the trial court. E.g., Marshall, supra.

II. The Alleged Master Plan Violation
I disagree with the majority's holding that the record lacks competent and substantial evidence, see Machado v. Musgrove, 519 So.2d 629 (Fla. 3d DCA 1987), review denied, 529 So.2d 693 (Fla. 1988), to prove that the county complied with master plan guidelines for the development of those environmentally sensitive portions of land upon which the tennis center sits. In point of fact, it is questionable whether the Machado strict scrutiny standard of review is even applicable here. Machado applies to situations where a landowner seeks a rezoning which is inconsistent with a master plan's zoning designation. The case at hand does not involve a rezoning. The majority acknowledges that the site at issue, zoned park land, is being permissibly used as park land. The issue here, as it regards the master plan, is whether the park land, concededly environmentally sensitive, was developed in accordance with the master plan's guidelines for such land. Consequently, this case is more analogous to Hillsborough County v. Putney, 495 So.2d 224 (Fla. 2d DCA 1986), which involved a conservation element written into that county's comprehensive plan. There, the court ruled that the standard of review in such cases is whether the zoning authority (county commission) abused its discretion or was clearly erroneous in its decision to approve or disapprove a development. Id. at 226. I would thus apply the abuse of discretion standard here and hold that the trial court acted totally within its discretion in holding that the evidence showed that the Dade County master plan's environmental guidelines have been complied within in the construction of the tennis center up to now.
Nevertheless, even if the Machado strict scrutiny test is applied, plaintiffs did not prove that Dade County violated the master plan. Plaintiffs alleged in their amended complaint that the property upon which the center stands is not zoned for commercial use and the use of the property for commercial *138 purposes is incompatible with its designation as an environmentally sensitive area. They allege that this "spot zoning" is inconsistent with the master plan. This allegation will not stand up to scrutiny. In Hanna the supreme court held that private parties may enter contracts to operate public park facilities for commercial profit. 94 So.2d at 601. Furthermore, the court today holds that the tennis center maintains a public park purpose and that its use for commercial benefit does not defeat the added restriction: "For public park purposes only."

A. The Bird Studies
Plaintiffs' only arguable point on the master plan issue is that the county failed to prove that it developed the facility following the strict guidelines contained in the Dade County Comprehensive Development Master Plan for developing environmentally sensitive areas. Relying on Machado, the majority finds that the county failed to prove by competent and substantial evidence that it followed the guidelines. To support this determination, the majority cites the former director of the Dade County Department of Environmental Resources Management (DERM), Anthony J. Clemente, who testified that certain evaluations of the project's impact on bird nesting were required; the majority then states that this witness admitted that he could not find these evaluations in the file or verify their completion. However, a reading of the record demonstrates that Clemente testified only that he could not find the evaluation after looking through one-quarter of the files stacked before him. His perusal of the files on the witness stand was cut short; the record shows that he never had an opportunity to completely search the files. Consequently, this witness's testimony was utterly incompetent to prove any disputed question of fact favorable to the plaintiff.
Furthermore, this evidence is incompetent to permit an inference that if Clemente had been given time to go through all the files, he would not have been able to locate any study which evaluated the impact of the project on birds. As the witness later testified, at least three evaluations of the center's environmental impact were done: one by Dade County, one by the State of Florida, and another by the federal Corps of Engineers. All of these evaluations recommended that the project permit be granted. Consequently, construing the evidence in the light most favorable to the county as the prevailing party, it must be inferred that the permits would not have been granted if any of these evaluations had found that bird nests and habitats at the old dump site and small surrounding area of mangrove had been observed. Plaintiffs presented no evidence whatsoever to the contrary.

B. Mitigation of Environmental Impact
The record is replete with evidence that the county took extensive measures to mitigate the impact on the environment caused by the tennis center's construction. In fact, much of the environmental concern of the responsible agencies portrayed in the record deals with the sealing off of the landfill and its effect on the water supply rather than with any damage done to wildlife habitats, native vegetation and the like. The unrebutted testimony of Peter Kerwin, Dade County's Chief Engineer for the Parks and Recreation Department and the man in charge of design and construction, was that the cleanup of the dump site actually improved the area from an environmental standpoint.
While 1.89 acres of mangrove which had concealed the dump and maintenance yard from Crandon Boulevard had to be destroyed, the county mitigated this by installing 3.98 acres of seedlings destined to become mangroves in another area within the project boundary. In order to receive permits to undertake the tennis center project, the county was required by the local DERM and the state Department of Environmental Resources (DER) to carry out a mitigation plan which would guarantee the re-seeding and an eighty percent survival rate of new mangroves. The plan required monitoring on a quarterly basis *139 over a two-year period by both the DERM and the DER.
Moreover, the county pledged to set aside 220 acres of mangrove growing adjacent to the project site as a conservation area. To insure this, the Corps of Engineers required as a condition of granting its permit that the county furnish the corps with an executed copy of the conservation easement. As a condition of the DER permit, the county was required to submit within ninety days of the permit's grant, the legal documents pursuant to section 704.06, Florida Statutes (1987), necessary to create and enforce the conservation easement of mangroves.
A review of the numerous studies, evaluations, exchange of letters between environmental agencies, and the mitigation plan undertaken by the county to insure compliance with the master plan abundantly supports the trial court's finding that the master plan has not been not violated in the construction of the tennis center up to now. While it is true that monitoring of the project by the DER showed that the county failed to comply with two aspects of its mitigation plan: namely, proper periodic testing of the ground water to insure it had not become contaminated by the sealing of the dump as well as the removal of a pathway crossing a small section of the newly planted mangroves, the county entered into a consent order with the DER to guarantee future compliance with its obligations.
Based on the above facts, I must dissent from the majority's holding that the county is to be enjoined from further development of the tennis center because of its violations of the master plan.

III. The Alleged Regional Impact Review Violation
Finally, I dissent from the holding that the Matheson heirs have standing to require the county to undergo Chapter 380, Florida Statutes, review of the tennis center. According to the clear terms of the applicable statute, only the Florida Department of Community Affairs (FDCA), the state land planning agency, has the power to require a developer, here the county, to undergo a Development of Regional Impact (DRI) review. § 380.032(1);[2] § 380.06(5)(b), Fla. Stat. (1987).[3] There is no private right to enforce this statutory provision.
The primary legislative intent behind DRI review was to involve local zoning officials and regional and state environmental authorities with property owners and developers in a comprehensive land use review technique which would have as its aim the preservation of Florida's natural resources. Caloosa Property Owners Ass'n v. Palm Beach County Board of County Commissioners, 429 So.2d 1260 (Fla. 1st DCA 1983). As the administrating state agency of Chapter 380, the FDCA monitors developments which meet the statutorily set thresholds defining a development of regional impact. See §§ 380.06(2)(a); 380.0651, Fla. Stat. (1987). When the agency determines that the threshold has been met, it is required by state statute to coordinate an extensive review assessing the regional impact of the project on the natural environment.[4] § 380.06. Carey Lee Rawlinson, Jr., the Coordinator of the Dade County Development Impact Committee, testified that as the coordinator of the development review committee in Dade County, *140 it is his job to oversee projects, both private and public, to insure that the projects are in compliance with Chapter 380. In this case, the applicable guideline states that any sports facility that will provide more than 10,000 permanent seats requires DRI review. § 380.0651(3)(b)1.b, Fla. Stat. (1987). However, up to now, there has been no request for a permit to build such a stadium even though such a project is planned for the future.
Rawlinson testified that his department questioned whether the tennis center on Key Biscayne would be required to undergo a DRI review. He said, "The state [FDCA] had asked us by telephone call to clarify for them what was presently approved and proceeding for development on the Key in regard to the tennis facility." The county wrote to the FDCA to advise that the clubhouse project had been approved by the Dade County Board of County Commissioners and that a stadium facility with more than 12,000 permanent seats was projected to be developed at the site at some future time. The county sought to ascertain whether and/or at what point in time DRI review should be undertaken. The FDCA responded that the construction of the clubhouse did not meet the threshold requirements for DRI review; however, the agency reserved its right to require such review should the county seek to obtain a permit to build the stadium. While the majority discusses this letter in terms of whether or not it constitutes a binding letter or preliminary agreement which would permit the county to forever forego any DRI review, the letter is more correctly viewed, as testified to by Rawlinson, as a clearance letter  a determination on the part of the statutorily authorized state agency that the statutorily mandated thresholds for DRI review had not been met as of the date of the letter.[5] At the least, the trial judge who heard and weighed the evidence was clearly permitted to reach this conclusion.
The majority's finding that the May 27 correspondence could not have been a clearance letter because such letters are not provided for by statute or FDCA rule is ingenuous; however, it fails to recognize a well-settled principle of administrative law known as free-form agency action.[6] Agencies, such as the FDCA, commonly use such procedure to transact day-to-day business. "Without summary letters, telephone calls, and other conventional communications, the wheels of government would surely grind to a halt." Capeletti Bros. v. State, Dept. of Transp., 362 So.2d 346, 348 (Fla. 1st DCA 1978), cert. denied, 368 So.2d 1374 (Fla. 1979). Clearly, the "clearance letter" which Dade County received from the FDCA was proper administrative procedure.
Case law holds that in specific instances, certain private parties may have a private cause of action when a development order has been granted or may be able to intervene in a proceeding where the grant of a development permit is being considered; e.g., Friends of the Everglades, Inc. v. *141 Board of County Comm'rs of Monroe County, 456 So.2d 904, 909 (Fla. 1st DCA 1984), review denied, 462 So.2d 1108 (Fla. 1985); Caloosa Property Owners Ass'n, 429 So.2d at 1264-1265; however, such is not the case here where the FDCA has determined that no DRI permit proceedings are necessary at this time.
In sum, nothing in Chapter 380 grants a private party the right to pursue a cause of action requesting the courts to require the FDCA to find that DRI review threshold requirements have been met and that DRI review must be undertaken. In this preliminary stage, private citizens are not afforded standing: when the development order is sought, concerned neighbors and the public at large will have a statutorily conferred opportunity to be heard. The administrative action of an agency charged with the enforcement of a statute or rule is entitled to great persuasive force and effect when that action is not in plain conflict with the statute. Public Employees Relations Comm'n v. Dade County Police Benevolent Ass'n, 467 So.2d 987, 989 (Fla. 1985). In this case, the county amply established before the trial judge that it placed the FDCA on notice of its contemplated action and that the agency determined the construction of the clubhouse did not require a DRI permit. For the plaintiffs to argue, and the majority to agree, that DRI review is now required in the face of the FDCA's decision that the project did not trigger the threshold requirements for such review is to say that the state agency was blind to its obligation and oblivious to its responsibility to enforce the statute.
Finally, appellants argue and the majority holds that, in effect, the FDCA did not do its statutory duty and find that the threshold for DRI review has been met because the aggregation rules, detailed in the majority opinion, have in fact been satisfied. The majority states that the construction of the tennis center courts, clubhouse, and proposed permanent stadium are each separate projects which, when considered as a whole, constitute a unified plan of development subject to the aggregation rules which can require DRI review. As I have set out above, I believe that resolution of this issue is premature; moreover, I disagree that those rules would even be applicable to the specific factual situation before us. The aggregation rules clearly apply to situations where a developer (or developers) is ostensibly planning to build two separate developments which, if considered as the two halves of one whole, would require DRI review. The plain language of the aggregation rules states that the rules apply to "two or more developments." Fla. Admin. Code Chap. 27F-18.003. Those rules contemplate the acquisition and development of distinct pieces of property. They do not address the phases of development on one piece of property. In a situation such as that before us, where the developer intends to develop one piece of property over a period of time, the developer apparently has at least two options if the DRI thresholds may be implicated. He can submit a master plan for the complete development and seek approval and building permits all at once, or he can build those phases of the project which do not trigger the DRI threshold, then seek permission to build those portions which do require DRI review. In the second instance, the developer is building at the risk that his entire project will never reach fruition should a DRI permit be denied. The county has apparently chosen to proceed into the gaping jaws of the FDCA by choosing the second option. It could well be that when a building permit is sought for construction of the stadium, a DRI permit will be denied. This is the risk the county has undertaken. Regardless, the plaintiffs will have their opportunity to voice concerns when a permit to build the stadium is sought. Based on this analysis, the majority's holding that the May 27, 1988 letter the county received from the FDCA is not a binding letter or a preliminary agreement is eminently correct. Of course, the letter is neither of those things because the review process has never been triggered.
In conclusion, I disagree with the majority's decision that the holding of the Lipton Tennis Tournament violates the deed restriction because I believe the evidence *142 shows: first, that Crandon Park remains open and accessible to the public at all times during the tournament and, second, that the temporary closing of the tennis center to prepare the site for the tournament does not amount to the public's ouster from that small section of the park much less the remaining ninety-five percent of the park. I further disagree that the construction of the tennis center violates the Dade County Comprehensive Master Plan. The county presented substantial, competent evidence to prove that proper steps were taken, within the dictates of the master plan, to protect the environmentally sensitive aspects of the site. The trial judge did not abuse his discretion in holding that the county complied with environmental guidelines. Furthermore, even applying a strict scrutiny analysis, plaintiffs did not prove Dade County violated the master plan. Finally, I do not believe that the Matheson heirs have standing or that this court has subject matter jurisdiction to require the FDCA, the state agency statutorily mandated to enforce Chapter 380, to undertake a Development of Regional Impact review. The FDCA, has ruled that the threshold requirements for DRI review will not be met at least until the county seeks a permit to build the proposed 12,000 seat stadium. I would cede to that agency's authority to interpret the applicable statutes and rules.
In practical terms, the winners of today's decision are the tennis-playing residents of the Key who will continue to enjoy the tennis facility twelve months out of the year. Ironically, however, it is the public that is ousted from complete use of the tennis facility.
Accordingly, I respectfully dissent.
NOTES
[1] The majority's statement that the county is not to be congratulated for changing use of the site from an impermissible dump to an impermissible tennis complex is inconsistent with its own holding that the tennis complex is permissible but that the public's ouster from the park and tennis complex during the tournament violates the deed restriction.
[2] land planning agency; powers and duties.  The state land planning agency shall have the power and the duty to:
(1) Exercise general supervision of the administration and enforcement of this act and all rules and regulations promulgated hereunder. § 380.032(1).
[3] or regional agencies may inquire whether a proposed project is undergoing or will be required to undergo development-of-regional-impact review. § 380.06(5)(b).
[4] If a development meets the statutory criteria for DRI review, the developer, together with the county zoning authority, must file an application with the regional planning agency and with the FDCA. § 380.06(6). The public  local, regional and state  is given timely notice of the hearing by the local zoning board. The regional and state environmental protection agencies are also notified and a detailed investigation is undertaken, involving extensive public involvement and public hearings before any development order is granted.
[5] The subject letter from the FDCA to the Dade County Developmental Impact Committee, dated May 27, 1988 states in part:

The development currently approved by local government, which consists of a 9,800 square foot clubhouse and locker room, does not, by itself, constitute a Development of Regional Impact (DRI). If the developer seeks approval to develop permanent seating at the tennis center, we request that he obtain a binding letter of interpretation of DRI Status, or that the project undergo DRI review pursuant to Chapter 380, Florida Statutes, if applicable. If any proposed development at the tennis center is determined to be a DRI, the developer may wish to request a preliminary development agreement to allow limited development prior to receiving a DRI development order.
The Department reserves all its rights pursuant to Chapter 380, Florida Statutes, concerning this development and further review of the project may be required if the developer's plans are materially changed.
[6] "`Free-form' proceedings are not subject to legal requirements with regard to any of the procedural elements, although legal requirements may exist with regard to nonprocedural elements. In free-form proceedings the agency is therefore at liberty to adopt any procedure it wishes, or no procedure at all." Capeletti Bros. v. State, Dept. of Transp., 362 So.2d 346, 348, n. 1 (Fla. 1st DCA 1978), citing H. Levinson, Elements of the Administrative Process, 26 Amer.L. Rev. 872, 880 (1977).