WELLS, Judge
(dissenting).
I respectfully dissent. Because I find that the ballot summary misled the voters and failed to disclose material information necessary for the public to' make an informed decision under section 101.161 of the 'Florida Statutes (2012), I would reverse.
1, Underlying Facts
• Twice before, this court has considered a dispute between members of the Matheson Family and the County over the erection of structures at the Crandon Park Tennis Center and IPC’s operation of a tennis tournament at that center. - See Dade Cnty. v. Matheson, 605 So.2d 469 (Fla. 3d DCA 1992); White v. Metro. Dade Cnty., 563 So.2d 117 (Fla. 3d DCA 1990). The underlying facts leading to the instant dispute between Bruce Matheson, the County and IPC are largely set forth in our initial decision in White:
. . In 1940, several- members of the Matheson family, deeded three tracts of land located on the northern portion of Key Biscayne, to Dade County. This land, consisting of 680 acres, came to be known as Crandon Park. In the recorded deeds, the grantors expressly provided:
This conveyance is made upon the express condition that the lands hereby conveyed shall be perpetually used and maintained for public park purposes only; and in case the use of said land for park purposes shall be aban- • doned, then and in that event the said [grantor], his heirs, grantees or as *234 signs, shall be entitled upon their request to have the said lands recon-veyed to them.
[[Image here]]
In 1986, the Dade County Board of County Commissioners passed Resolution R-891-86, which authorized the execution of an agreement with Arvida International Championships, Inc., (Ar-vida), and the International Players Championship, Inc., (IPC), to construct a permanent tennis complex. The construction of the court facilities and ⅛ frastructure began in the summer of 1986, and terminated in 1987. Initially, the tennis complex consisted of fifteen tennis courts, service roads, utilities, and landscaping, all located on 28 acres.
The agreement provided that for- two weeks each year, subject to a renewal provision, the tennis complex would become the site of the Lipton International Players Championship Tennis Tournament (Lipton tournament). This renowned tournament is only open to world class players who compete for two weeks.
In February 1987, the first Lipton tournament was held 'before approximately 213,000 people. The county manager considered the Lipton tournament to be such a'tremendous success that he recommended,, and -the County Commission approved in Resolution R-827-87, the construction of “Phase II,” a permanént clubhouse/fitness facility. This 15,000-to-33,000-square-foot facility was to house locker rooms, training and exercise equipment, meeting rooms, food and beverage concessions; and a sporting goods store. As a result of “community input,” the clubhouse was ultimately reduced to 9,800 square feet. This “community input” consisted of informal meetings with residents and one public hearing.
During the four Lipton tournaments held thus far on Key Biscayne, temporary seating has been provided. Appellants contend that a 12,000-seat permanent stadium is part of the future development plans.
[[Image here]]
In 1987 and again in 1988, Dade County attempted to obtain the consent of one of the heirs, Hardy Matheson, for the operation of the Lipton tournament. Hardy Matheson refused-to give his consent, and informed the County that the tennis complex and the operation of the Lipton tournament was contrary to the deed restriction.
White, 563 So.2d at 121-22.
In White, we held that while “the construction of the tennis park complex did not violate the ‘public park purposes only’ provision of the deed restriction,” operation of the tournament did' violate the restriction because it “deprive[d] the public of the use and enjoyment of Crandon Park, including the use and enjoyment of the tennis facilities.” Id. at 123-24. The basis for the violation was that operation of the tournament, as "it was at that time, amounted to the “virtual ouster of the public from the park for periods of time during the two week tournament.” Id. at 125. As we explained:
Our ruling does not prevent Dade County from using the tennis complex for tennis tournaments. It merely seeks to insure that in holding such tournaments, public access to the rest of Crandon Park is not infringed; and use of the tennis complex is not denied to the public for unreasonable periods of time.
Id. at 126, ,
In 1991, Matheson heirs filed a second lawsuit specifically directed at the construction of a- permanent 7,500-seat stadium at the tennis complex, claiming that *235 the stadium construction -violated the deed restriction on the subject property. The trial court agreed with the Mathesons and entered a permanent injunction, prohibiting the construction. We reversed-, finding that our resolution of the first lawsuit, in White had already addressed whether construction of a stadium as part of the proposed tenpis complex violated the terms of the Matheson deed restriction and . concluded that it did not.. See Matheson, 605 So.2d at 470. We also noted that although the second lawsuit did not raise any arguments that the tennis tournament as it was then being run still amounted to á “virtual ouster” of the public from Crandon Park in violation of the deed restriction,' anyone with proper standing to raise that issue “would have the right to go back before the original trial court; [which] has jurisdiction over this matter,- to seek the appropriate relief or enforcement,-be it of a[n] equitable nature or otherwise.” Id. at 471. Encouraged by this statement, the Mathe-sons filed an Emergency Motion for Supplemental and Additional' Relief- and to Amend Final Judgment -in the • first (the White) proceeding.
On January 14, 1993, while this motion was pending, the Matheáon Family and the County entered into a Settlement Agreement to “amicably resolve once and for all time, the appropriate park uses to which the County may put Tracts 1, 2 and 3 of the Crandon Park lands and the locations of such uses within the Crandon Parks lands.” To this end, the ■ Settlement Agreement called for the creation of a Crandon Park Master Plan, drafted by experts, subjected to public scrutiny, and implemented by. a “Declaration of Restrictions” recorded in the public records to run with the land:
(a) Creation. The Parties agree that a Crandon Park Master Plan shall be prepared by the professional park planning Olmsted Firm ... depicting all permitted uses of various areas on the Crandon Park lands.... It is the Parties’ intention that the Crandon Park ■ Master Plan created pursuant to this Settlement Agreement, and implemented through the Declaration of Restrictions hereinafter described, shall determine for all time (subject to amendment as herein after provided) the uses of, and improvements upon, and their location within, the Cran-don Park lands.
(b) Consultation With The Parties; Draft Plan; Final Plan; Amendment. In creating the Crandon Park Master Plan, the Olmsted Firm shall consult .with the County and its designated Park professionals,, and with the Matheson Family, and their designated representatives. In. addition the Olmsted Firm ■shall consult with the County’s professional tennis tournament operators concerning the use of the “Tennis Center” at Crandon Park ... for the operation of-the International Players Championship .... The -Olmsted Firm shall submit a draft of the Crandon Park Master Plan ... to the Parties, and the County shall hold a public hearing [therejon....
(Emphasis added).
This agreement, among other things, expressly provided that the Crandon Park Master Plan was to “be consistent with all of the terms of this Settlement Agreement,” and that no new or additional permanent structures would be erected at the Tennis Center:
No New Permanent Structures on the Tennis Center.... Except as provided above with respect to the [then contemplated] permanent tennis stadium, the Tennis Center' shall include only such permanent structures as are presently located on the Tennis Center....
*236 The Settlement Agreement also provided that the Master Plan, as implemented by a Declaration of Restrictions that was to be recorded in the public records of Miami-Dade County and made part of the final judgment in White, would be subject to change or amendment only upon approval by both the County Commission and a Committee on Amendment of the Crandon Park Master Plan:
The Crandon Park Master Plan as implemented by the above mentioned Declaration of Restrictions and Final Judgment, may be amended following adoption only by the following procedure: (1) the County by affirmative vote of the County Board of Commissioners shall propose an amendment through action by resolution; (2) the County shall appoint two persons to a Committee on Amendment of the Cran-don Park Master Plan, and the National Parks and Conservation Association (or a successor non-profit park preservation organization mutually agreed upon by the Parties) shall likewise appoint two members to such Committee on Amendment of the Crandon Park Master Plan. The Committee shall consider the proposed amendment to the proposed Crandon Park Master Plan and an affirmative vote of no less than three members of such Committee shall be required to amend the Crandon Park Master Plan, which amendment shall be incorporated by the County in an amendment to the Declaration of Restrictions implementing the Crandon Park Master Plan. Should a proposed amendment to the Crandon Park Master Plan fail to receive an affirmative vote of at least three members of such Committee on the Amendment of the Crandon Park Master Plan, the proposed amendment shall fail and the Crandon Park Master Plan shall be enforced as previously in force.
As contemplated by the Settlement Agreement, a Crandon Park Master Plan was drafted and approved by the Mathe-son Family and the County. That 102-page plan and its 24 appendices delineate detailed objectives for all areas comprising Crandon Park.[3] Among other things, this plan expressly precludes construction of virtually any additional permanent structures within Crandon Park:
Except as expressly provided in this Master Plan, there shall be no new structures, improvements, features, or major modifications to existing structures or improvements (defined as renovations or repairs constituting more than 50% of the value of the existing structure or improvement), whether temporary or permanent, located or constructed on the Crandon Park Lands, provided that resurfacing of any tennis court in excess of 50% of the value of the court shall be permitted.
With regard to the Tennis Center, described in the Master Plan as comprising a tennis stadium, a clubhouse, and 27 tennis courts, no new permanent structures or expansion whatsoever was authorized:
No New Permanent Structures on the Tennis Center ... Except as provided ... with respect to the permanent tennis stadium, the Tennis Center shall ‘ include only such permanent structures as are presently located on the Tennis *237 Center and depicted in the Master Plan Site Plan.
Significantly, the Master Plan provides that any amendments either to it or to the contemplated Declaration of Restrictive Covenants memorializing it . “shall be adopted sparingly, in conformity with [the Master Plan’s] Statement of Intent and consistent with the provisions of the Settlement Agreement reached on January 14, 1993 by and between the' Matheson family and Dade County.”[4]
On August 25, 2000, as required by the Settlement Agreement . between the Matheson Family and the County, a Declaration of Restrictive Covenants was recorded in the public records of Miami-Dade County. That Declaration confirmed that consistent with the Settlement Agreement and the Crandon Park Master Plan: (1) it was the intention of the County and the Matheson Family for all time to restrict the use of and improvements to Crandon Park by limiting those uses and improvements to those authorized by the Crandon Park Master Plan; (2) that under the Master Plan no structures or improvements other than those then contemplated or existing and described in the Master Plan were to be made at Crandon Park unless authorized by the Declaration which incorporated the terms of the Master Plan and Settlement Agreement; (3) that the Declaration with its incorporated Settlement Agreement and Master Plan were to run with the land; and (4) the Declaration was not subject to modification except as provided by the Settlement Agreement and Master Plan — that is, with the approval of both the County Commission and the Committee on Amendment of the Crandon Park Master Plan:
WHEREAS, in order to fulfill the re- ■ quirements of the Settlement Agreement [between the County and thé Matheson Family] and forever to resolve the disputes and’ litigation between [them], the County [as owner of Cran-don Park] has agreed to restrict the uses of and the improvements upon Crandon Park as provided in this Declaration, subject to modification or amendment only in accordance with the provi- • sions contained herein;
[[Image here]]
1. CRANDON PARK MASTER PLAN. Upon the recordation of this Declaration, the [Crandon Park] Property shall be restricted to those uses and improvements set forth in the Crandon Park Master Plan attached hereto .'.. subject to modification or amendment Only in 'accordance with the provisions contained therein. It is the intention of the County and the Matheson family that the Crandon Park Master Plan, which has been created pursuant to the Settlement Agreement and implemented ' through this Declaration, shall determine for all time (subject to modification or amendment only as herein provided) the uses of, and improvements upon; and their- location within, the [Crandon Park] Property. No structure, improvement or other facility, whether permanent or temporary, shall be located or constructed upon the [Crandon Park] Property unless provided by the terms of this Declaration.
2. BINDING EFFECT OF DECLARATION. This Declaration shall *238 constitute a covenant running with the land, and shall be binding upon the County, -upon it. successors and assigns, and upon all parties having any right, title or interest in [the Crandon Park] Property. This Declaration shall be recorded in the public records of Miami-Dade County, Florida, and shall remain in full force and effect until such time as the Declaration is modified or amended in accordance with the terms contained herein.
[[Image here]]
4. MODIFICATION AND AMENDMENT. This Declaration may be modified or amended only in accordance with the provisions contained in the Settlement Agreement dated January 14,1993, which appears as Appendix F to the Crandon Park Master Plan ... and upon compliance with the terms of such Settlement Agreement as to amendment of the Crandon Park Master Plan, by a written instrument duly recorded in the public records of Miami-Dade County.
Finally, on October 18, 2000, pursuant to the terms of the Settlement Agreement, the trial court in White entered an Amended Final Judgment approving and incorporating the Crandon Park Master Plan and ordering the parties to comply with the provisions of that plan and the Declaration of Restrictive Covenants.

2. The Instant Matter

On August 23, 2012, the County’s Board of County Commissioners passed Resolution R-660-12, authorizing the following question to be placed on the November 2012 ballot:
Referendum Regarding Structures and Modifications of Existing Agreements for the Tennis Center at Cran-don Park In accordance with Article 7 of the Home Rule Charter, do you approve as set forth in Resolution R-660-12:
• Erection of permanent structures' and expansion of existing structures at ' Crandon Park Tennis Center for public park and tennis tournament use, which shall be funded solely by tennis center and tournament revenues and private funds; and
• Modification and extension of agreements with operator of Sony Open Tennis Tournament or its successors.
Attached to the resolution was a detailed proposal for additional permanent structures to be constructed at the tennis complex, including: numerous new permanent additions to the current stadium; three new permanent courts with spectator grandstands; ‘ a lake cottage; and open pavilions. Also attached to the resolution were the proposed terms for the extension and modification of existing agreements between the County and IPC, pursuant to which IPC operates an annual tennis tournament at the Tennis Center. Therein, IPC proposed a new operating agreement to replace the ¿xisting agreement, to fund the development of the additional permanent structures at the tennis complex, and to be allowed to lease office space within the current stadium for year round use.
Although no agreement from the Committee on Amendment of the Crandon Park Master Plan to amend the Master Plan or to modify the Declaration or the Settlement Agreement to allow the proposed additional structures or use of the park was secured, the referendum approved by the County Commission was placed on the November 6, 2012 ballot and approved by the voters of Miami-Dade County.
A month after the election, Bruce Matheson filed the instant action against *239 the County seeking to invalidate the referendum on three grounds: first, he claimed that the ballot title and summary of the referendum failed to comply with section 101.161 of the Florida Statutes (count I); second, he claimed that the ballot-title and summary of the referendum violated article 7 of the County’s Home Rule Charter (count II); and third, he claimed that the County’s misstatements and concealments with respect to the referendum and Resolution R-660-12 violated paragraph A(2) of the Citizens’ Bill of Rights in the County’s Home Rule Charter (count III). IPC was allowed to intervene in the action.,
While this matter was pending, the County finalized an agreement with IPC which it claims are within the parameters delineated in Resolution R-660-12. The Board of County Commissioners conditionally approved that agreement. -
In August 2018, Matheson moved for entry of final summary judgment. As to count I, he argued that the ballot title and summary of the referendum violated the accuracy requirements of section 101.161 of the Florida Statutes by failing to inform the electorate of the existence of the Settlement Agreement and Amended Final Judgment in the White litigation, as well as the Crandon Park Master Plan and the Declaration of Restrictive Covenants, all of which operate to restrict future expansion of the tennis complex subject to the Master Plan being amended as set forth in the Settlement Agreement, As to count II, he argued that the ballot title and summary of the referendum' violated article 7 of the County’s Home Rule Charter by asking the voters to endorse what were then nonbinding proposals for the expansion of the tennis complex and to approve agreements between the County and IPC that.had yet to be negotiated. Matheson made no arguments in his -motion with respect to count III.
The County opposed the motion and also moved for summary judgment on Mathe-son’s claims. As to count I, the. County argued that section 101.161 was not violated because the required amendment of the Master Plan by three of four voters on the Committee on Amendment of the Crandon Park Master Plan was “the needle in the proverbial haystack of development approvals required to accomplish the Tennis Center project,” therefore, it was not necessary to mention anything specifically •with respect thereto either in the ballot question or in the resolution, referenced therein. The County also argued that the ballot title and summary were sufficiently specific to put the voters on notice of the chief purpose of the referendum. As to count II, the County argued that the referendum did not violate Article 7- of the Home Rule Charter because it was not required to present the voters with fully negotiated, final deals prior to the issues being put on the ballot. IPC filed its own cross-motion for summary judgment, arguing that summary judgment should be granted on Matheson’s claims for many of the same reasons argued by the County.
After ■ holding a hearing on the parties’ motions, the trial court entered an order granting, final summary judgment in favor of the County and IPC as to counts I and II, finding the “ ‘chief purpose’ of the referendum was properly provided to the voters by the title and ballot summary,” and as to count III because Matheson .had made no argument as to it. This appeal ensued.

3. Legal Analysis

The standard of review of the instant final summary judgment is de novo. See Miami-Dade Cnty. v. Vill. of Pinecrest, 994 So.2d 456, 457 (Fla. 3d DCA 2008) (applying a de novo standard of review in determining whether a local referendum *240 complied with the accuracy requirements of section 101.161 of the Florida Statutes).
Florida law requires that every ballot initiative placed before the public for a vote must be accompanied by a short title and a summary which clearly and unambiguously state the primary purpose of the ballot initiative:
Whenever a ... public measure is submitted to the vote of the people, a ballot summary of such ... public measure shall be printed in clear and unambiguous language on the ballot after the list of candidates.... The ballot summary of the ... public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure.... The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.
§ 101.161(1), Fla. Stat. (2012) (emphasis supplied); Askew v. Firestone, 421 So.2d 151, 155-56 (Fla.1982) (confirming thát section 101.161 applies to “all ballots”); see also Wadhams v. Bd. of Cnty. Comm’rs of Sarasota Cnty., 567 So.2d 414, 416 (Fla. 1990) (applying section 101.161 to a county ballot initiative to amend a county charter).
The purpose of these requirements “is to assure that the electorate is advised of the true meaning, and ramifications, of an amendment” so that the electorate is not misled but is put on “fair notice of the decision [it] must make.” Askew, 421 So.2d at 155-156; see also Wadhams, 567 So.2d at 416. This means not just that a ballot title and summary must faithfully track the text of a proposed initiative, but that they may not “fly under false colors” or “hide the ball” by failing to disclose the initiative’s true effect. Armstrong v. Harris, 773 So.2d 7, 16 (Fla.2000).
In Askew, for example, the Florida Legislature by joint resolution proposed an amendment to Section 8 of Article II of the Florida Constitution relating to lobbying by former legislators and statewide elected officials. That proposal would have removed an absolute two-year ban on lobbying by former legislators and statewide elected officials who filed financial disclosures. Askew, 421 So.2d at 155. While the title to the proposed amendment and its summary accurately disclosed that former legislators and statewide elected officials who failed to file financial disclosures would be precluded from lobbying activities for two years, it was struck down for failure to disclose that the proposal would repeal the existing, more stringent post-term prohibition on lobbying:
As it stands, subsection 8(e) precludes lobbying a former body or agency for two years after an affected person leaves office. The ballot summary neglects to advise the public that there is presently a complete two-year ban on lobbying before one’s agency and, while it does require the filing of financial disclosure before anyone may appear .before any agency for the two years ■ after leaving office, the amendment’s chief effect is to abolish the present two-year total prohibition. Although the summary indicates that the amendment is a restriction on one’s lobbying activities, the amendment actually gives incumbent office holders, upon filing a financial disclosure statement, a right to immediately commence lobbying before their former agencies which is presently prohibited. The problem, therefore, lies not with what the summary says, but, rather, with what it does not say.
[[Image here]]
If the legislature feels that the present prohibition against appearing before one’s former colleagues is wrong, it is appropriate for that body to pass a joint resolution and to ask the citizens to *241 modify that prohibition. But such a change must stand on its own merits and not be disguised as something- else. The purpose of section 101.161 is to assure that the electorate is'a’dvised of the true meaning, and ramifications, of an amendment. A proposed . amendment cannot fly under false colors; this one does.
Id. at 155-56 (some emphasis added) (footnote omitted); see also Wadhams, 567 So.2d at 416 (invalidating a vote approving an amendment to a county charter because although the amendment’s title" and summary accurately tracked the amendment’s language which provided that the County’s Charter Review Board would only be permitted to meet once every four years, the ballot failed to explain that currently there was no restriction on meetings — thus, making the chief purpose of the amendment to curtail the Board’s right to meet).
In Armstrong, the Florida Supreme Court struck a ballot initiative because, much like in Wadhams, the Ballot was defective “for what it d[id] not say.” Armstrong, 773 So.2d at 21. There, the Court first found a ballot title and summary “flew under false colors” because the ballot misleadingly implied that by amending article I, section 17 of the Florida Constitution to prohibit imposition of “cruel and unusual punishment” rather than “cruel or unusual punishment,” the rights of Florida citizens would be enhanced or promoted through the rulings of the United States Supreme Court:
Use of the word “or” instead of “and” in [article 1, section 17] indicates 'that -the framers intended that both alternatives (i.e., “cruel” and “unusual”) were to be embraced individually and disjunctively within the Clause’s proscription. ■
This Court in Traylor v. State, 596 So.2d 957 (Fla.1992), explained that our system of constitutional government in Florida is grounded on a principle of “robust individualism” and that our state constitutional rights thus provide greater freedom from government intrusion into the lives of the citizens than do their federal counterparts.... In short: “[T]he federal Constitution ... represents the floor for basic freedoms; the state constitution, the ceiling.” Id.
In the present case, by changing the wording of the Cruel or Unusual Punishment Clause to become “Cruel and Unusual” and by requiring that our state Clause be intérpreted in conformity with its federal counterpart, the proposed amendment effectively strikes the state Clause from the constitutional scheme. Under such a scenario, the organic law governing either cruel or unusual punishments in Florida would consist of a floor ... and nothing more....
In the present cáse, a citizen could well have voted in favor of the proposed amendment thinking that he or she was protecting state constitutional rights when in fact the citizen was doing the exact opposite — i.e., he or she was voting to nullify those rights.
Armstrong, 773 So.2d at 17-18 (footnote omitted).
The Armstrong Court then concluded that the ballot summary also “hid the ball” by failing to accurately state the chief purpose or main effect of the proposed amendment, that is, to nullify the Cruel or Unusual Punishment Clause of Florida’s constitution:
To conform to section 101.106(1), a ballot summary must state “the chief purpose” of the proposed amendment. In evaluating an amendment’s chief purpose, a court must look not to subjective criterial espoused by the amendment’s sponsor but to objective criteria inherent in the amendment itself, such as the amendment’s main effect. In the pres *242 ent case, as explained above, the main effect of the amendment is simple, clear-cut, and beyond dispute: The amendment will nullify the Cruel or Unusual Punishment Clause. This effect far outstrips the stated purpose (i.e., to “preserve” the death penalty), for the amendment will nullify a longstanding constitutional provision .that applies to all criminal punishments, not just the death penalty. Nowhere in the summary, however, is this effect mentioned — or even hinted at. The main effect of the amendment is not stated anywhere on the ballot. (The voter is not even told on the ballot that the word “or” in the Cruel or Unusual Punishment Clause will be changed to “and” — a significant change by itself.)
Id. at 18 .(footnotes omitted); see also Village of Pinecrest, 994 So.2d at 458 (invalidating a.ballot initiative amending Miami-Dade County’s Home Rule Charter because its title flew under false colors by promising to create a uniform county wide fire and rescue service when one had long existed and hid the ball by purporting to create new rights while actually curtailing or eliminating them).
Here, as in Askew and Armstrong, the ballot summary both “flpes] under false colors” and “hide[s] the ball.” While the ballot summary suggests that the electorate is being asked to “approve” the “[e]rection of permanent structures and expansion of existing structures at Crandon Park Tennis Center for public park and tennis tournament use” and “modifications and extension of agreements” with IPC, in reality it is nothing more than a conditional or non-binding straw ballot with no binding official effect. Compare City of Miami v. Staats, 919 So.2d 485, 486-87 (Fla. 3d DCA-2005) (finding a City of Miami ballot question which clearly stated that it was a. “Straw Ballot” and asked “Shall the voters of Miami-Dade elect the Tax Assessor instead. of the County Manager of .Miami-Dade County, appointing the Tax Assessor,” flew under false colors and hid the ball because the ballot title and summary failed “to adequately inform the voting public that their response ha[d] no official effect, i.e., that the ballot question [was] simply a nonbinding opinion poll”), with City of Hialeah v. Delgado, 963 So.2d 754, 757 (Fla. 3d DCA 2007) (finding that a straw ballot which asked “Would you support a voter petition” to resolve the same issue addressed in Staats complied with section 101.161(1) because the ballot language adequately informed the voters that thé ballot measure had no binding effect).
.The ballot summary also “hid[ j the ball” by failing to mention or disclose that approval of the proposed changes were conditioned on the agreement of a third party, the Committee on Amendment to the Crandon Park Master Plan. That is, the summary failed to inform the voters that the changes proposed by the resolution for which approval was sought could not be made by virtue of a “yes” vote oh the referendum. See Armstrong, 773 So.2d at 21 (finding a ballot question hid the ball from the voters where the “ballot title and summary give no hint of the radical change' in state constitutional law that the text actually foments”); Askew, 421 So.2d at 156 (striking a resolution that proposed a constitutional amendment because the ballot summary was “misleading to the public concerning material changes to an existing constitutional provision”).
The County takes exception to the view that it hid the ball, suggesting that Resolution R-660-12.which is referred to in the ballot summary adequately addresses these matters. It points to exhibit B to the resolution wherein IPC proposed “that it would undertake to seek the receipt of all required development approvals to en *243 sure that all the Additional Permanent Structures comply with all legal obligations.” (Emphasis supplied). The County suggests that the amendment of the Master Plan “is just one of many development approvals that [IPC] will need to obtain in order to upgrade the existing, and construct new, facilities at” the tennis complex, comparing it to a laundry list of development approvals it must obtain before the proposed expansion may occur, from the U.S. Army Corps of Engineers to the South Florida Water Management District. Not only is the. County’s argument misleading, it is also wrong. , (
The subject Master Plan prohibition on the erection of permanent structures at Crandon Park is a unique condition that only applies to this public park, is the result of a Settlement Agreement reached after years of litigation, and is memorialized in the public record in a Declaration of Restrictive Covenants that 'runá with the land — none of which are even mentioned in the resolution. The Master Plan amendment process is hardly the equivalent of the routine approvals that must be secured before making an improvement on public land. Moreover, to increase or expand the structures' currently located at the Tennis Center would require more than just a modification of the Crandon Park Master Plan. It would also entail invalidating the Settlement Agreement and Declaration of Restrictive Covenants, and modifying a long since -final judgment— none of which are simply routine development approvals. In any event, reference to “development approvals” in an exhibit to the subject resolution is not sufficiently clear and unambiguous to inform the voters of the unique circumstances that exist as to expansion of the tennis complex at Crandon Park or to the' conditions that must be met before any expansion may occur.
This all could have been avoided simply by advising voters that the approvals being sought were conditioned on approval by a third party, all of which easily could have been accomplished in seventy five words as required by section 101.161:
In accordance with Home Rule Charter Article 7, and subject to Crandon Park Master Plan Amendment Committee approval, do you approve as .Resolution R-660-12 provides:
• Erection of permanent structures and expansion of existing structures at Crandon Park Tennis Center for public park and tennis tournament use, to be funded solely by tennis center and tournament revenues and private funds; and
• Modification and extension of agreements with operator of Sony Open Tennis Tournament, or its successors.
In finding that the ballot summary fails to comply with section 101.161(1), I do not disagree with the County’s contention that Article 7 of the County’s Home Rule Charter requires that voters also approve of the proposed expansion of the tennis complex and modification/extension of agreements with IPC in a County-wide referendum. However, if the voters are being asked to approve the changes that the County wished to make, they must be made aware of the fact that the County’s desires and their approval of them are conditional or will not effectuate the proposed changes.
Finally, IPC questions the validity of the Settlement Agreement' in the White proceeding, suggesting that the Master Plan amendment process was an unlawful delegation of legislative authority by the Board of County Commissioners. However, IPC abandoned this argument at the summary judgment hearing below, agreeing that this question would be resolved in separate litigation pending, .in the circuit court. A substantial portion.of IPC’s Answer Brief *244 on this appeal is dedicated to this very issue, which IPC candidly admits is not now properly before us in this appeal. Indeed, after spending some twenty pages providing the factual background for and discussing the “unlawful delegation” issue, IPC concedes “[t]hat issue can only be solved in [the trial] court, such as in IPC v. Matheson, which may later reach this Court.” Needless to say, this particular issue need not be addressed in this appeal.

4. Conclusion

Because the ballot summary misled the voters as to the true legal effect' of the referendum and failed to disclose material information necessary for the public to make an informed decision under section 101.161, I would find that the ballot is defective and that the post-election results of the subject referendum must be invalidated. I would therefore reverse the order granting final summary judgment in favor of the County and IPC and remand with instructions that final summary judgment be granted in favor of Matheson.

. The areas specifically addressed were Cran-don Boulevard, the Crandon Park Marina, the ibis preserve, the Crandon Park Golf Course, the Crandon Park Tennis Center, the West Point Preserve, the Fire Station, the' Calusa Mangrove Trail and Archaeological sites, the Crandon Park Service Area, the Crandon Park Zoo and Gardens, the Crandon Park Cabanas, the Parking and Beach Drive, the Crandon Park Beach, the Crandon Park Visitors and Nature Center, and the Bear Cut Preserve.

. The’ Declaration of Restrictive Covenants similarly provides that any modification - or amendment of the Declaration itself must be made in accordance with the provisions of the Master Plan, and .that any modification or amendment of the Master Plan may be made ‘,‘only in accordance with the provisions contained in the Settlement Agreement dated January 14, 1993.